

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York  10007*

January 3, 2008

The Honorable Harold Baer
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street, 2230
New York, NY  10007

>  Re:  **United States v. Rodriguez et al.**,
>        S1 07 Cr. 699 (HB)

Dear Judge Baer:

  The Government respectfully submits this letter to notify the Court and the defendant of the Government's intention to offer evidence of past acts committed by defendant Bryant De Los Santos.

  The Government seeks to elicit testimony from the cooperating witnesses regarding (1) one prior armed robbery of a drug dealer by Bryant De Los Santos, and (2) other prior attempted robberies of drug dealers committed by De Los Santos. The robbery and attempts to rob should be admissible because they (1) explain the development of the illegal relationship among De Los Santos and the co-conspirators, and (2) completes the story of the crimes charged in the Superseding Indictment.

## BACKGROUND

  The defendants are charged in a two Count Superseding Indictment (the "Indictment") with conspiracy to commit a robbery, and with conspiracy to possess with intent to distribute cocaine, in violation of Title 18, United States Code, Section 1951, and Title 21, United States Code, Section 846.

  As alleged in the Complaint, in early June 2007, a confidential informant ("CI") told law enforcement about a group of individuals who he had committed robberies with in the past. (See Compl. ¶ 3) According to the CI, he knew one of the individuals as "Flaco," later identified as Lorenzo Rodriguez,

The Honorable Harold Baer
January 3, 2008
Page 2

a/k/a "Flaco," one of the defendants in this case. "Flaco," according to the CI, was the organizer of the group, and was able to recruit other individuals to assist in robberies. (Id. ¶ 3.) Thereafter, the CI made several consensually monitored and recorded telephone calls to "Flaco" discussing setting up a robbery of a drug dealer who purportedly would have approximately 25 kilograms of cocaine. (Id. ¶¶ 4, 5.) Eventually, an undercover ("UC") special agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), was introduced to "Flaco" over the telephone by the CI. (Id. ¶ 5.) The CI told "Flaco" that the UC would fly to New York from Puerto Rico to provide information on where several kilograms of cocaine would be delivered. The UC also contacted "Flaco" on several occasions, and eventually told "Flaco" that he was coming to New York. (Id.)

On or about June 25, 2007, the CI and the UC contacted "Flaco" and arranged to meet at a hotel the following day. (Id. ¶ 6.) On June 26, 2007, at approximately 2:00 p.m., the UC contacted "Flaco," and told him that he was staying at a hotel near JFK airport. During the course of this conversation, the UC told "Flaco" to bring all of the people who were going to be part of the robbery. The UC told "Flaco" that he wanted to meet them to make sure they knew who he was. (Id. ¶ 6.) Later that day, at approximately 5:00 p.m., Rodriguez and Jacinta De La Cruz, a/k/a "Jose Cirrasquillo," a/k/a "Tio," came to the hotel room to meet with the UC. (Id. ¶ 7.) This meeting was recorded using audio and video equipment, JFTF members monitored the meeting in a hotel room next door to where the meeting took place. (Id. ¶ 7.)

At this meeting, the UC told Rodriguez and De La Cruz that he worked for a company that transported cocaine for a group of Colombians. (Id. ¶ 8.) The UC also told Rodriguez and De La Cruz that his organization was upset with the Colombians because they were not getting paid. (Id. ¶ 8.) This, according to the UC, was why the UC wanted to steal the cocaine. The UC asked Rodriguez and De La Cruz if this job was too big for them, and they said that it was not. (Id. ¶ 8.) The UC told Rodriguez and De La Cruz that he picks up between 25 and 30 kilograms of cocaine every few months in New York for this organization. The defendants asked the UC what he typically does with the cocaine after he picks it up. The UC informed the defendants that he drives the cocaine to Miami, Florida. (Id. ¶ 8.) The UC told Rodriguez and De La Cruz that he picks up the cocaine from a location in the Bronx. The UC told them that he would not learn the location of the house until the following morning. (Id. ¶ 8.) The UC told Rodriguez and De La Cruz that the way the organization operates is that if he leaves the location with the

The Honorable Harold Baer
January 3, 2008
Page 3

cocaine, then he is responsible for it.  (Id. ¶ 8.)  Therefore, the robbery had to take place at the location where the drugs were stored.  The UC told Rodriguez and De La Cruz that there would be three individuals inside the house, and that at least one of the individuals would be armed.  (Id. ¶ 8.)

Rodriguez and De La Cruz discussed how the robbery would take place.  The defendants told the UC that they would enter the location, order everyone to the ground, and tie up everyone.  (Id. ¶ 8.)  They also told the UC that they would tie him up as well, so that it did not look suspicious.  In addition, De La Cruz told the UC that he would take the UC's chain and watch to protect the UC.  When describing the way they would enter the house, De La Cruz made a motion with his hands appearing to be carrying a firearm.  (Id. ¶ 8.)  Rodriguez and De La Cruz also asked the UC about the neighborhood where the robbery would take place.  (Id. ¶ 8.)

The UC asked Rodriguez and De La Cruz how many other individuals were going to participate in the robbery.  De La Cruz responded that he was going to recruit several other individuals to participate in the robbery with them.  (Id. ¶ 8.)

The UC discussed with Rodriguez and Cirrasquilla how they would divide the proceeds of the robbery.  They agreed that the UC would get 10 kilograms of cocaine, and the other participants would receive the rest.  (Id. ¶ 8.)  They agreed that if there was more than 30 kilograms of cocaine, they would further negotiate a different split.  The UC told Rodriguez and De La Cruz to have everyone available the following day by 12:00 p.m., and told them that he would call Rodriguez at approximately 2:00 p.m. and tell them where to meet in the Bronx. (Id. ¶ 8.)  The UC told the defendants that he would receive a telephone call at approximately 3:00 p.m. with the location of the cocaine.  (Id. ¶ 8.)  He also told them that, prior to doing the robbery, he was going to provide them with a van for them to use during the robbery.  (Id. ¶ 8.)  The UC told Rodriguez and De La Cruz that they should return the van, with his share of the cocaine, to the same location after the robbery.  (Id. ¶ 8.)

Following the meeting at the hotel on June 26, 2007, Rodriguez called the UC at approximately 9:30 p.m.  This telephone call was recorded.  (Id. ¶ 9.)  During the course of this conversation, Rodriguez told the UC that he had discussed the plan with his people, and that there was a "small problem."  According to Rodriguez, his "guys" were not happy with the proposed split of cocaine.  (Id.)  Rodriguez told the UC that "because at least five or six of us have to come along," the UC should not get ten kilograms of cocaine.  (Id.)

The Honorable Harold Baer
January 3, 2008
Page 4

      The following day, on June 27, 2007, at approximately 1:00 p.m., Rodriguez called the UC and told him that he had all of his people ready to go. (See Ex. B, ¶ 9.) The UC told Rodriguez that he would call them later that day when he was in the Bronx. At approximately 2:30 p.m., the UC contacted Rodriguez and told him to meet him at a gas station in the Bronx. (Id. ¶ 9.) The UC gave the address of the gas station to Rodriguez. Approximately fifteen minutes later, Rodriguez arrived at the gas station on foot. The UC asked where the rest of the group was, and Rodriguez stated that they were driving around, and that they would not agree to meet the UC. (Id. ¶ 9.) The UC told Rodriguez that he had to meet the other individuals who were going to do the robbery, so they could see what the UC looked like. (Id. ¶ 9.) After discussing this for approximately fifteen minutes, Rodriguez said the he did not want to do the robbery. (Id. ¶ 9.)

      Thereafter, the CI placed a telephone call to Rodriguez to reassure him that the UC could be trusted. Following that conversation, Rodriguez called the UC and told him that he, and the other individuals, would come to the gas station approximately five minutes later. (Id. ¶ 10.)

      Approximately fifteen minutes later, Rodriguez arrived back at the gas station on foot. (Id. ¶ 11.) Rodriguez got into the car with the UC, and told the UC that they were ready to go pick up his people. (Id. ¶ 11.) The UC drove Rodriguez approximately one or two blocks, and then Rodriguez got out of the car, and into a vehicle driven by De La Cruz. De La Cruz thereafter pulled his vehicle over to the side of the road, and instructed the UC to wait. Approximately two minutes later, De La Cruz pulled into the street, and the UC observed a Range Rover pull in behind him. (Id. ¶ 11.) The UC proceeded to a pre-determined location inside a storage facility, and was followed by the vehicle driven by De La Cruz and the Range Rover.

      When the UC arrived at the storage facility, the two vehicles parked outside the facility. (Id. ¶ 12.) Eventually, the UC drove his car back outside the storage facility, and picked up Rodriguez, and drove him to storage unit where the van was stored. (Id. ¶ 12.) De La Cruz, as well as the individuals in the Range Rover, one of whom was Bryant De Los Santos, remained outside the storage facility. (Id. ¶ 12.) Thereafter, the defendants were arrested.

The Honorable Harold Baer
January 3, 2008
Page 5

## DISCUSSION

A.  **Testimony About A Prior Robbery and Prior Attempted Robberies of Drug Dealers By De Los Santos Should Be Admitted To (1) Explain the Development of the Illegal Relationship Among De Los Santos and His Co-Conspirators, And (2) Completes the Story of the Crimes Charged in the Superseding Indictment.**

The Second Circuit "ha[s] adopted an inclusionary approach to evaluating Rule 404(b) evidence, which allows evidence to be received at trial for any purpose other than to attempt to demonstrate the defendant's criminal propensity." United States v. Edwards, 342 F.3d 168 (2d Cir. 2003) (internal quotation marks and citations omitted). Thus, the Second Circuit has repeatedly held that such prior act evidence is admissible to: (1) explain the development of the illegal relationship between participants in the conspiracy; (2) explain the mutual trust that existed between conspirators; or (3) complete the story of the crime charged. See United States v. Rosa, 11 F.3d 315, 333-34 (2d Cir. 1993) (evidence of prior acts of car theft and drug dealing properly admitted under Rule 404(b) to show development of illegal relationship between defendant and co-conspirator and to explain how defendant came to play important role in conspiracy); United States v. Pitre, 960 F.2d 1112, 1119 (2d Cir. 1992) (evidence of prior narcotics transactions admissible as relevant background information to explain relationship among alleged co-conspirators); United States v. Roldan-Zapata, 916 F.2d 795, 804 (2d Cir. 1990) (evidence of pre-existing drug trafficking relationship between defendant and co-conspirator admissible to aid jury's understanding of how transaction for which defendant was charged came about and his role in it); United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994) ("evidence of other bad acts may be admitted to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense"); United States v. Langford, 990 F.2d 65, 70 (2d Cir. 1993) ("evidence of acts committed prior to the time charged in the indictment [admissible] to prove the existence of the alleged conspiracy").

The Government seeks to elicit testimony from two co-conspirators who are cooperating witnesses, Jacinta De La Cruz, a/k/a "Jose Cirrasquillo," a/k/a "Tio," and Lorenzo Rodriguez, a/k/a "Flaco," regarding De Los Santos' prior criminal activity. In particular, on one occasion, De Los Santos participated in a robbery of a drug dealer of at least one kilogram of cocaine. It is expected that De La Cruz will testify that he knew a drug

dealer who was selling cocaine. He is expected to testify that he arranged with De Los Santos and one other individual to meet the drug dealer in an apartment building, purportedly to purchase the cocaine. At the pre-arranged time, De Los Santos and the other individual met the drug dealer, and, brandishing a firearm, robbed the drug dealer. De La Cruz will testify that, according to De Los Santos, as De Los Santos was leaving the area, someone from a higher floor of the apartment building shot at him. De Los Santos went directly to De La Cruz after this, and reported what had happened. The cocaine was divided among De La Cruz, De Los Santos, and the third individual. The fact that De La Cruz had utilized the services of De Los Santos in the past to rob drug dealers is direct and significant evidence that establishes a past criminal relationship. It also explains in an obvious way why De La Cruz recruited De Los Santos in this case to assist in the robbery at issue in this case.

Lorenzo Rodriguez, a/k/a "Flaco," will also testify about a past criminal relationship with De Los Santos. He will testify that on at least two other occasions, De Los Santos attempted to rob a drug dealer of cocaine. Similar to the robbery described above, De Los Santos was recruited by Rodriguez to rob the drug dealers. This evidence should be admissible under Federal Rule of Evidence 404(b) in the Government's direct case because the robberies (1) explain the development of the illegal relationship among De Los Santos and his co-conspirators, and (2) completes the story of the crimes charged in the Indictment. Further, to the extent De Los Santos claims mistake, lack of intent, or lack of knowledge, this evidence should be admitted to refute this claim.

The proffered evidence explains the development of the illegal relationship among the co-conspirators. This evidence explains the mutual trust De La Cruz and Rodriguez had in De Los Santos, and why they recruited De Los Santos to participate in the charged robbery. It also completes the story as it relates to this case. The reason De La Cruz and Rodriguez went to De Los Santos was so that De Los Santos could recruit others to assist in the robbery. As such, the prior robberies committed by De Los Santos with his co-conspirators explains the development of the illegal relationship. See Rosa, 11 F.3d at 333-34. Similarly, the past criminal relationship illustrates why the cooperating witnesses and De Los Santos trusted each other when arranging the robbery in this case. In sum, by the time the cooperating witnesses contacted De Los Santos and asked him to participate in this robbery and to recruit others to help, they had already committed multiple crimes together, thus providing the basis for the fact that the co-conspirators trusted each other enough to conspire to rob a drug dealer and

The Honorable Harold Baer
January 3, 2008
Page 7

divide and distribute the expected proceeds. Roldan-Zapata, 916 F. 2d at 804; United States v. LaSanta, 978 F.2d 1300, 1307 (2d. Cir. 1992), abrogated on other grounds, 526 U.S. 559 (1994); Inserra, 34 F.3d at 89. The evidence of the prior robberies thus renders more plausible De Los Santos' participation in the conspiracy charged in the Indictment, and is therefore relevant as direct proof of those crimes.

Moreover, the evidence would be admissible pursuant to Federal Rule of Evidence 404(b) in order to rebut De Los Santos' claims he lacked the requisite intent or knowledge to commit the crimes charged in the Indictment. Fed. R. Evid. 404(b); United States v. Aminy, 15 F.3d 258, 259-60 (2d Cir. 1994); United States v. Zackson, 12 F.3d 1178, 1182 (2d Cir. 1993) ("Where a defendant claims that his conduct has an innocent explanation, prior act evidence is generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged"); United States v. Cassiere, 4 F.3d 1006, 1021-1022 (1st Cir. 1993) (evidence of uncharged transactions in wire fraud prosecution admissible to show defendants' knowledge of preparing and submitting fraudulent documents). The proof at trial will show that De Los Santos acted with the appropriate state of mind to commit the offense charged, demonstrating their knowledge and intent with respect to robbery activities and relationship to their co-conspirators.[*]

Additionally, the proffered evidence should also be admitted because the cooperating witnesses were participants in the prior robberies, and therefore the robberies amount to Giglio material for both cooperators. Again, as detailed above, both cooperators would testify that they participated in at least three armed robberies in the past with De Los Santos before the events in this case. Thus, it is incumbent on the Government pursuant to United States v. Bagley, 473 U.S. 667 (1985), and Giglio v. United States, 405 U.S. 150 (1972), to apprise the defendants to these acts, and the Government is permitted to elicit the witnesses' testimony about the acts "to avoid the appearance that it [is] concealing impeachment evidence from the jury." United States v. Coonan, 938 F.2d 1553, 1561 (2d Cir. 1991); United States v. Louis, 814 F.2d 852, 856 (2d Cir. 1987).

---

[*] The Government will not object to the Court giving a proper limiting instruction pursuant to the admission of evidence under Rule 404(b). See United States v. Zackson, 12 F.3d 1178, 1182 (2d Cir. 1993).

The Honorable Harold Baer
January 3, 2008
Page 8

      Lastly, there is no basis to exclude the prior robbery and attempted robberies under Federal Rule of Evidence 403 because the robberies are highly relevant and probative of the conspiracy charged in the Indictment. Rule 403 provides that relevant evidence may be excluded "if its probative value is <u>substantially</u> outweighed by the danger of <u>unfair</u> prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403 (emphasis added). The evidence of uncharged crimes will not be unfairly prejudicial, because the nature of that evidence is no more violent or prejudicial than that specifically charged in the Indictment, which concerns the attempted robbery with firearms of a drug dealer of approximately 25 kilograms of cocaine. Further, the evidence of uncharged crimes will not be cumulative, because that evidence will not otherwise be before the jury. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Gilliam</u>, 994 F.2d 97, 100 (2d Cir. 1993) ("[E]vidence is prejudicial only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence") (citation omitted). Moreover, the evidence of the prior robberies will not cause undue delay or waste time, because it will take the form of testimony from witnesses who will already be on the stand to testify about the crimes specifically charged in the Indictment.

The Honorable Harold Baer
January 3, 2008
Page 9

## CONCLUSION

For the reasons stated above, the evidence of the prior robbery and attempted robberies should be admissible in the Government's direct case.

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney

By: _____
TODD BLANCHE/KATHERINE A. LEMIRE
Assistant United States Attorneys
(212) 637-2494/2532

cc:   David Segal, Esq.
      Attorney for Defendant Demi Abriham
      (212)-571-0938 (facsimile)

      Louis R. Aidala, Esq.
      Attorney for Defendant Bryant De Los Santos
      (212) 750-8297 (facsimile)

      Robert Blossner, Esq.
      Attorney for Defendant Pedro Cabrera
      (212)571-0938